Abbie D. REARDON, by Thomas M. Reardon and B. Scott Reardon, Guardians of the Estate of Abbie D. Reardon, Incompetent, and Thomas M. Reardon and B. Scott Reardon as Guardians of the Estate of Abbie D. Reardon, Incompetent, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. No. 1120.

United States District Court
D. South Dakota, S. D.

Feb. 17, 1958.

Robert C. Heege (of Davenport, Evans, Hurwitz & Smith), Sioux Falls, S. D., for plaintiffs.

Clinton G. Richards, U. S. Atty., and Lyle E. Cheever, Asst. U. S. Atty., Sioux Falls, S. D., and Thomas H. Foye, Department of Justice, Washington, D. C., for defendant.

MICKELSON, Chief Judge.

This is an action brought against the United States of America for the recovery of federal income taxes in the total amount of $6,219.34, together with interest, which the plaintiffs allege have been erroneously and illegally assessed and collected. The plaintiffs are the taxpayer, Abbie D. Reardon, an incompetent, and Thomas M. Reardon and B. Scott Reardon, as guardians of her estate.

The taxpayer's claim is based on her contention that for the taxable years 1953 and 1954, she was the "head of a household" within the meaning of the applicable provisions of the Internal Revenue Code; and, therefore, that she was entitled for those years to the benefit of the reduced surtax rates available to the "head of a household" as those rates are set forth for the year 1953 in Sec. 12(c) (1) of the Internal Revenue Code of 1939, as amended by the Revenue Act of 1951, 26 U.S.C. 1952 ed., Sec. 12, and for the year 1954 in Sec. 1(b) (1) of the Internal Revenue Code of 1954, 26 U.S.C. 1952 ed., Supp. II, Sec. 1. It is not contested that the taxpayer paid her income taxes for the years in question without the benefit of the above rates, and that she made claims for refunds to which the District Director notified her she was not entitled.

The definition of a "head of a household" in the 1939 Revenue Code, as amended by the Revenue Act of 1951, is set forth in Sec. 12(c) (3), 26 U.S.C. 1952 ed., Sec. 12, as follows:

"For the purposes of this chapter, an individual shall be considered a head of a household if, and only if, such individual is not married at the close of his taxable year and maintains as his home a household which constitutes for such taxable year the principal place of abode, as a member of such household, of:

"(A) A son, stepson, daughter, or stepdaughter of the taxpayer, or a

descendant of a son or daughter of the taxpayer, but if such son, stepson, daughter, stepdaughter, or descendant is married at the close of the taxpayer's taxable year, only if the taxpayer is entitled to an exemption for the taxable year for such person under section 25(b); or

"(B) Any other person who is a dependent of the taxpayer, if the taxpayer is entitled to an exemption for the taxable year for such person under section 25(b).

"An individual shall be considered as maintaining a household only if over half of the cost of maintaining the household during the taxable year is furnished by such individual."

This definition is repeated in substantially identical form, with no changes affecting this case, by Sec. 1(b) (2) of the Revenue Code of 1954, 26 U.S.C. 1952 ed., Supp. II, Sec. 1.

The pleadings have considerably narrowed the issues in this case by the following admissions: the taxpayer was neither married nor was she a surviving spouse, within the meaning of the revenue laws, during either taxable year; throughout both years she maintained as her home a household which constituted for both years her principal place of abode; and the taxpayer furnished over one-half of the cost of maintaining that household during both years. Accordingly, the question of whether the taxpayer qualified during those years as a "head of a household", and in fact the decision in this case, hinges on the determination of whether or not the taxpayer's household constituted the principal place of abode, as a member of such household, of the taxpayer's daughter, one Anne Reardon.

The case was tried before the court without a jury, and the evidence discloses the following salient facts, which are largely undisputed, bearing on this single issue for determination: the taxpayer and her husband had a family of six children, one of whom was Anne, and prior to the summer of 1950, the family home was maintained at 220 North Summit Avenue, Sioux Falls, South Dakota; the taxpayer's husband died in 1945 when Anne was 30 years old, and soon thereafter, Anne, as the only unmarried female child, became the single remaining member of the taxpayer's household; although Anne physically lived in the family household the major portion of her life, she worked and lived in both Washington, D. C., and New York City from 1937 to 1939, later spent a period in Washington, D. C., during 1946 and 1947, and in October of 1949 she accepted employment in New York City and lived there in a furnished one-room apartment until October of 1952; in the summer of 1950, the taxpayer moved her residence to 2015 South Fourth Avenue in Sioux Falls, and Anne assisted her mother in moving and in selecting the furnishings for the new home; during her employment in New York City from 1949 to 1952, Anne spent all her vacation periods in Sioux Falls, and on those occasions she occupied one bedroom in the two-bedroom new home, which was referred to by her and Thomas M. Reardon as "her room"; this room contained Anne's furniture which was previously kept in the room she occupied in the old home, and, besides Anne, it was not occupied by anyone except an occasional overnight visitor; the new home also contained dishes, linens, furniture and other personal belongings which were Anne's; the vacation periods in which Anne came to Sioux Falls consisted of three weeks in the summer and one week at Christmas, her last visit being in July of 1952; Anne's stay in New York City was dependent on her retention of employment there, and she did not consider it her home; she did not vote in New York, and she filed her income tax returns in South Dakota; Anne did not plan on leaving her New York job until she became ill in October of 1952, when she then gave up her one-room apartment and entered a sanitarium in Connecticut; her personal effects consisting of books, clothes, pictures and jewelry were sent to Sioux Falls; in order that she might be closer to home, and because of her continued

need of psychiatric care, she was transferred to a sanitarium in Dubuque, Iowa, in June of 1953, and she remained there for the balance of the taxable years in question; during those two years, the room in the new home, which Anne and Thomas M. Reardon testified had been set aside for her, was kept in the same condition as before; while Anne was in these sanitaria, the taxpayer furnished substantial amounts for her medical care and support, constituting over one-half of Anne's support for those two years; Anne's illness was diagnosed as a schizophrenic reaction of the paranoid type; it was her doctor's intention and goal to return Anne to her home in Sioux Falls upon her recovery, and there is substantial evidence that the same was Anne's intention; and at all times after Anne's admission in June of 1953 to the Dubuque sanitarium, her doctor was hopeful that she would, under proper care, make a satisfactory recovery.

■ The "head of a household" provision, which was first enacted in 1951, has been construed by the courts on very few occasions. However, the reports of the committees of the enacting Congress leave no doubt as to the intent and purpose behind the law. The following excerpts adequately indicate this:

> "It is believed that taxpayers, not having spouses but nevertheless required to maintain a household for the benefit of other individuals, are in a somewhat similar position to married couples who, because they may share their income, are treated under present law substantially as if they were two single individuals each with half of the total income of the couple." H.Rep. 586, 82nd Cong., 1st Sess., 1951–2 Internal Revenue Cumulative Bulletin, p. 364.

> "Section 12(c) is intended to apply only where the taxpayer and such other members of the household live together in such household during the entire taxable year (except for temporary absences due to special circumstances). The fact that a

child may be at college during the college term does not prevent the home of the taxpayer from also constituting the principal place of abode of the child. However, such home will not be considered as the principle place of abode where the child establishes a separate habitation and only returns for periodic visits. Similarly, such home will not be considered as constituting the principal place of abode of a dependent of a taxpayer who is supported by the taxpayer for a substantial part of the year in lodgings other than those occupied by the taxpayer even though such person may at various periods live in the household, unless the residence of the dependent in other lodgings is not permanent and is due to necessity such as illness." S.Rep. 781, Part 2, 82nd Cong., 1st Sess., 1951–2 Internal Revenue Cumulative Bulletin, p. 554.

Certain conclusions can be drawn from these and other similar congressional committee reports. For an extensive review of such reports, see Walter J. Hein v. Commissioner, 28.92 P-H TC (1957). The main purpose of this legislation was to provide relief for single persons who maintained households for the benefit of, and necessarily shared their income with, certain other individuals. It was recognized that the individual sharing the taxpayer's income and benefiting by the taxpayer's maintenance of a household, will normally live in the physical household. Nevertheless, Congress further recognized that the situation, to which relief was intended to be given, might exist even though the sharer of the taxpayer's income is not actually present in the taxpayer's household, providing the absence therefrom is not permanent. The most clear example of such a situation is illness. Under such a circumstance, Congress unquestionably intended that the taxpayer still be entitled to relief.

Consistent with this congressional intent, the treasury regulations have amplified the statutory phrase "principal place

of abode." 26 CFR (1953) 39.12–4(c) states, with reference to the 1939 Revenue Code:

"The taxpayer and such other person must occupy the household for the entire taxable year of the taxpayer. They will be considered as occcupying the household for such entire taxable year notwithstanding temporary absences from the household due to special circumstances. A nonpermanent failure to occupy the common abode by reason of illness, education, business, vacation, military service or a custody agreement under which a child or stepchild is absent for less than six months in the taxable year of the taxpayer, shall be considered a temporary absence due to special circumstances. Such absence will not prevent the taxpayer from qualifying as the head of a household if (1) it is reasonable to assume that the taxpayer or such other person will return to the household, and (2) the taxpayer continues to maintain such household or a substantially equivalent household in anticipation of such return."

26 CFR (1956) 1.1–2(c) states the identical language pertaining to the "head of a household" provision of the 1954 Revenue Code.

The only decisions which are of any assistance in construing the phrase "principal place of abode" and the above regulations are the Hein case, supra, and Cockrell v. United States, 1 AFTR 2nd 58–394 (1957). While these cases present different factual situations, both are taxpayers' attempts to satisfy the statutory requirement of "principal place of abode" by reason of one of the exceptions enumerated in the treasury regulations. The Hein case involved the taxpayer's elderly spinster sister who lived in a sanitarium during the entire taxable year for which the taxpayer was claiming the "head of a household" rates, and, also, for the six years immediately prior thereto, although before that period she had made her home with the tax-

payer for 22 years. The taxpayer paid for the support of his sister during her stay in the sanitarium, but the doctors held slight hope for her recovery, and the taxpayer apparently made no showing that he was maintaining the home in preparation for his sister's return. In the Cockrell case it was the taxpayer's status which was questioned, for he claimed his principal place of abode was a home in the city where his invalid sister and aged mother lived, although he worked and spent a great part of his time in a distant city. In both cases the issue was resolved in favor of the taxpayer. Both of these decisions represent a judicial intent to liberally construe the "head of a household" provision in favor of the taxpayer. That such a liberal construction is in accord with the treasury regulations was noted by the Tax Court in the Hein case, wherein it stated:

"The Treasury Regulations, also, indicate that the statute is not to be given a narrow or restricted construction." Hein, supra, at 28–471.

The government's defense in the instant case rests on the following reasoning: that the exception in the case of illness is intended only to preserve the status of the individual in the taxpayer's household and not to create such a status, and Anne's presence in New York from 1949 until October, 1952, destroyed her status in her mother's household so that, upon her entrance into the sanitarium, Anne had no pre-existing status in Sioux Falls to preserve. The government then concludes that Anne's principal place of adobe in 1953 and 1954 was the sanitarium.

The government's position that an absence due to illness can only preserve but cannot create a status is not well taken, because that question is not before us. In this regard, however, the contention that the requisite status in the taxpayer's household can never begin with a circumstance which is a permissible absence creates a technical requirement found neither in the words nor the spirit of the law, and ignores factual

situations that might arise. In any event, in the instant case, bearing in mind the whole factual history, it would be unrealistic to say that Anne had no status in her mother's household prior to her hospitalization. Anne never belonged to any household except her mother's, and the fact that there were periodic changes in the amount of time she was actually present in that household has no effect on the essential nature of her status there. True, Anne had a place of abode in New York City from 1949 until October of 1952 where she spent a major portion of her time, but as the Tax Court in the Hein case noted, one may have two abodes:

> "The Congress, by employing the adjective 'principal' in referring to the abode of the person whom we shall hereinafter call the 'dependent' has implied that such person may have more than one 'abode'." Hein, supra, at 28–471.

Whether New York City or Sioux Falls was Anne's principal place of abode during those years is of little importance, because there was admittedly a complete abandonment of the New York City abode in October of 1952, and the evidence fails to show that there was ever an abandonment of the Sioux Falls household. The single fact of importance when we consider her status during her hospitalization in 1953 and 1954 is that it was only the Sioux Falls household to which Anne retained her ties.

In the light of Anne's previous periods of out-of-town employment from which she had always returned to Sioux Falls, and the fact that her stay in New York City depended on her retention of employment there, and the type of simple living quarters maintained by her, and the periods spent in Sioux Falls during the years 1949 to 1952, and the maintenance of Anne's room by the taxpayer, and the retention of Anne's personal property in the taxpayer's household, all of these facts taken together with the overall picture of the close relationship between this only unmarried daughter and her mother, make it unreasonable to conclude that Anne had abandoned her mother's household and destroyed her relationship there by her acceptance of employment in New York City. We find, therefore, that Anne had a status in her mother's household when she entered the sanitarium.

■■ Moreover, this case cannot be properly considered without constant reference to the purpose and intent behind the enactment of the "head of a household" provision. When a taxpayer establishes herself in a category of persons to whom Congress intended relief be given, she is clearly entitled to that relief. In the case at bar, when Anne gave up her New York City apartment and her employment there upon the advent of her illness, her mother, as the head of the only household this girl ever had, did the natural thing and provided the material necessities of life, together with medical care, for her child. This manner of providing for her daughter, of sharing income with her, differs from the situation when they lived together in Sioux Falls, only in the respect that these things were provided through the sanitarium. But this is the very type of special circumstance which Congress and the regulations contemplate. The taxpayer's household, as Congress recognized, is not always a tangible and stationary thing, but can be somewhat intangible and flexible, reaching outside of the physical bounds of the home to extend its benefits and protection to all of its members, who by reason of special circumstance, cannot be physically present for a time, however long and undetermined. Here the taxpayer's household reached out to the sanitarium to care for a member unable to be home because of illness. Had Anne's illness been of such a nature that only out-patient care had been required, and yet was serious and disabling enough to prevent employment, there is no doubt in the Court's mind but that Anne would have returned physically to her mother's home in Sioux Falls. Then there would be no question as to her mother's qualifications as a "head of a household". The fact

that her illness required treatment in a sanitarium, thereby preventing her return to Sioux Falls, cannot be used to defeat the purpose of the law and the regulations thereunder. Nor, when considered in the light of reasonableness and the nature of Anne's illness, can we find any basis in fact or in law for the government's contention that it can be assumed Anne "chose" to enter the sanatorium.

Dr. Pieckenbrock's testimony was consistently to the effect that Anne desired to return to Sioux Falls and that only her state of health prevented it. For her own benefit the doctor used the fact of the taxpayer's own illness to get Anne out of the idea of going home until she had recovered. Furthermore, the doctor's testimony clearly establishes the fact that Sioux Falls was the only place Anne would be sent upon her recovery, and that New York City was not in the picture as such a goal. There is nothing in the record to indicate that Anne, her family, or her doctors wanted Anne to go any other place except her mother's home in Sioux Falls, or that Anne remained in the institution for any reason other than her ill health. Under these circumstances we cannot hold that Anne's principal place of abode, within the meaning of the statute, was the sanitarium or that it was any other place but her mother's home. The failure to occupy that home was an absence due to illness within the meaning of the regulations.

Nor are we able to hold, under the facts herein, that Anne did not have a principal place of abode during the years 1953 and 1954. Such a position here would be inconsistent with the intentions of Congress and the regulations.

 Both the Hein and Cockrell cases are significant for the importance which they attach to the matter of domicile as evidence of principal place of abode. Bearing in mind the significance of domicile of origin, and that intention is the keystone of domicile, all of the evidence in the instance case supports the conclusion that Anne's domicile during 1953 and 1954 was Sioux Falls.

A further contention made by the government is that even though it appeared that Anne's illness was of a temporary nature from which she could reasonably be expected to recover, it was not reasonable to assume that Anne would return, upon release from the sanitarium, to her mother's household in Sioux Falls. In view of what we have previously said, we find no validity in this contention.

 The government also argues that where, as in this case, the member of the taxpayer's household is not a minor child, that the statute and regulations should be more strictly construed. We find nothing in the reports of Congress, the statute or the treasury regulations which lends any credence to such argument. Also, the Hein and Cockrell cases recognize no such distinction.

Since we believe that the factual situation here is somewhat unusual, this statement in the Hein decision is pertinent:

> "None of the tests suggested in the Committee Reports and in the regulations deal specifically with illness; and in our opinion they were intended to be guides, and not to provide rules-of-thumb or formulas for handling all cases and situations which might arise. Rather, we think that in determining the 'principal place of abode', each case must be decided on its own particular facts and circumstances." Hein, supra, at 28–471.

 For all of the foregoing reasons we find as a matter of fact, and conclude as a matter of law, that the principal place of abode of Anne Reardon during the years 1953 and 1954, within the meaning of the statutory and regulatory authorities herein cited, was the taxpayer's household, and that Anne was a member of such household; and, further, that the taxpayer has met all the requirements necessary to be considered a "head of a household" within the meaning of the statutory definitions herein cited and was entitled, therefore, to the benefit of the surtax rates available to a "head of a household", and that, no ques-

tion appearing as to the amounts involved, the plaintiffs are entitled to recover the amounts prayed for in their complaint.

Counsel for plaintiffs may prepare and submit to the Court, upon ten days notice to counsel for defendant, findings of fact, conclusions of law and judgment in accordance with this memorandum decision.