**Joseph F. ELWARD, Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee.**

**No. 71-1773.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 10, 1973.

Decided July 3, 1973.

John F. Riordan, John F. Kelly, Edward S. Macie, Chicago, Ill., for plaintiff-appellant.

James R. Thompson, U. S. Atty., William T. Huyck, Asst. U. S. Atty., Chicago, Ill., Scott P. Crampton, Asst. Atty. Gen., Charles R. Burnett, Atty., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before PELL, STEVENS and SPRECHER, Circuit Judges.

PELL, Circuit Judge.

The sole issue on this appeal is whether, during the years 1961 through 1965, taxpayer Joseph Elward qualified as a "head of a household" as defined in Section 1(b)(2), 26 U.S.C. § 1(b)(2),

now Section 2(b)(1), of the Internal Revenue Code of 1954. The Commissioner of Internal Revenue had disallowed Elward's computations in his income tax returns based on the lower rates applicable to a head of household and, therefore, had assessed a deficiency against Elward in the amount of $43,098.99 plus interest. The taxpayer subsequently paid the deficiency and filed for a refund in the district court. After hearing Elward's evidence, the court granted the Government's motion to dismiss pursuant to Rule 41(b), Fed. R.Civ.P. This appeal followed.[1]

Section 1(b)(2) provided in pertinent part:

"For purposes of this subtitle, an individual shall be considered a head of a household if, and only if, such individual is not married at the close of his taxable year . . . and . . .

(A) maintains as his home a household which constitutes for such taxable year the principal place of abode, as a member of such household, of—

(i) a son . . . of the taxpayer . . . .

"For purposes of this paragraph . . ., an individual shall be considered as maintaining a household only if over half of the cost of maintaining the household during the taxable year is furnished by such individual."

The parties agree that Elward's status as a head of a household during the years in question depends on whether Elward's apartment in Chicago was "the principal place of abode" of James Elward, the taxpayer's adult unmarried son.

## I

Plaintiff taxpayer's case at trial consisted of his testimony, his son's testimony, and some exhibits. The trial judge, sustaining the objections of the Government, refused to admit into evidence several of the exhibits proffered by Elward.

The evidence admitted at trial established the following. Taxpayer's son James was born in 1928 and attended school in the Chicago area until he went to Washington, D. C., to complete his college education. Subsequently, he entered military service. When he was discharged in August 1952, he returned to Chicago. In October 1952, however, unable to find job opportunities in Chicago, James went to New York City to pursue his chosen career of acting and writing for the theater. During his first two years in New York, he resided in a hotel where he paid rent at a monthly or a weekly rate. He then leased, on a multi-year basis, an unfurnished apartment having a living room, kitchenette, and bedroom. In 1961, he moved to a larger apartment; at the time of trial, June 1971, he still rented that apartment. In 1952, 1953, 1959, and 1960, James enrolled in acting classes at Columbia University.

From 1952 to 1961, taxpayer's son returned to Chicago from three to six times each year, primarily for holidays and family occasions. The stays in Chicago lasted from a few days to a week. James spent the remainder of each year in New York, with the exception of a few months in 1953 when he performed as an actor in Washington, D. C., a six-month trip to Europe in 1958, and, in the latter part of the 1950's, nine weeks each year in New Hampshire as a member of a summer stock company.

During the period of 1961 through 1965, the years in issue here, James returned to Chicago six or seven times annually. One third of these trips lasted only a few days and the remainder lasted five to seven days. Except for a por-

1. Our jurisdiction derives from 28 U.S.C. § 1291.

The district court sustained the Commissioner's determinations with respect to other claims made by the taxpayer in his complaint. Elward does not here challenge those adverse findings. The court's findings of fact and conclusions of law may be found at 28 Am.Fed. Tax R.2d 71–5498 (N.D. Ill. 1971).

tion of the summers of 1963 through 1965 when he was part of the summer stock company in New Hampshire and a few trips to California in connection with his work, James spent the balance of his time in New York City.

During these years, James worked mainly as a television writer. He did most of his work in his New York apartment, where he kept his typewriter, resumés, clippings, notices, files, and reference books. His business contacts, including his agents, were located in New York City. He received mail at his New York address; he maintained a checking account, a savings account, and a safety deposit box at the Chase Manhattan Bank; he opened charge accounts in New York; he was listed in the New York telephone directory; and he attended church regularly in New York. Further, James was treated by several doctors in New York City, had his annual dental checkup, and underwent an operation there.

James testified that he maintained the following connections with Chicago: he kept some clothes in "his" room at the seven-room apartment rented by his father; he had his own key to that apartment; he had a checking account at a Chicago bank; and he attended Holy Name Cathedral when he was in the city. He further stated that he had not filed New York income tax returns; that he was registered to vote in Chicago and had voted in all the major elections; and that, in 1964–65, he had received a questionnaire and a summons for jury duty from the Jury Commissioners of Cook County, Illinois. The testimony also revealed that none of James's agents was located in Chicago, that he had no personal charge accounts there, and that he had not been listed in the Chicago telephone directory during the years 1961 through 1965.

After hearing the taxpayer's evidence, the trial court concluded that "plaintiff has not proven that his home at 222 East Chestnut Street in Chicago was the 'principal place of abode' of his son James during the years 1961 through 1965." The court found that "[t]he overwhelming portion of James Elward's time since 1952 has been spent in places other than Chicago, principally in New York City. . . . [He] established a separate habitation and returned to Chicago only for periodic visits." The court also declared that the pertinent legislative history "indicates that Congress did not intend to apply the head of household rates to [Joseph Elward]. . . . "

## II

The statute refers to *"principal place of abode,"* not merely to "place of abode." The emphasis is as much on "principal" as on the fact of abode. Although "principal place of abode" is obviously the crucial term for the disposition of this case, the statute unfortunately provides no definition, and few cases have hinged on the meaning of the phrase. Because of this lack of a coherent body of precedent, some judges and litigants have turned to concepts which have been more frequently analyzed. Taxpayer Elward, for example, would have had the district court evaluate his son's connections with Chicago versus his connections with other places (primarily New York City) by using the criteria for "domicile." Congress, however, did not adopt that term. We agree with the Tax Court's discussion of this matter in Prendergast v. Commissioner of Internal Revenue, 57 T.C. 475, 481 (1972), presently on appeal in the Ninth Circuit Court of Appeals, wherein the court, *inter alia,* rejected taxpayer's contention that "principal place of abode" is synonymous with "domicile."

In those few cases where construction of "principal place of abode" has been crucial, the courts have relied mainly on the relevant Treasury regulation and on inferences from legislative history. The

applicable regulation here is § 1.1–2, now § 1.2–2.[2] Helpful portions of the legislative history are included in Hein v. Commissioner of Internal Revenue, 28 T.C. 826 (1957), and Reardon v. United States, 158 F.Supp. 745 (D.S.D.1958), and need not be repeated in toto here.

The Treasury regulation quoted in footnote 2 reflects the views expressed in the Committee Reports that accompanied the passage of section 12(c), Internal Revenue Code of 1939, the predecessor of section 1(b)(2) of the 1954 Internal Revenue Code.[3] The Reports indicate that Congress's primary purpose in enacting the head-of-household provisions was to give an unmarried taxpayer some of the income-splitting benefits of married couples where the taxpayer must maintain a home for a child and share his income in order to provide for the child or where the taxpayer has other similar, serious family responsibilities. And we note particularly the statements in H.Rep.No.586, 82d Cong., 1st Sess., pp. 8–11, 105–107, including that the taxpayer's home "will not be considered as the principal place of abode where the child establishes a separate habitation and only returns for periodic visits." U.S.Code Cong. & Admin.Serv.1951, p. 1893. See also S. Rep.No.781, 82d Cong., 1st Sess., pp. 8–11.

In light of the wording of the statute, the regulation, and the legislative history, we must reject the argument that physical occupancy in the household by a taxpayer's child is insignificant and that the alleged intent of the child to return to the household is dispositive. Some case law does suggest that prolonged physical absence or the unlikelihood of return to the abode by a dependent is insufficient by itself to defeat a taxpayer's claim to head-of-household status, see, e. g., Hein v. Commissioner of Internal Revenue, *supra*. Those decisions, however, do not discount the importance of physical occupancy by the person whom the taxpayer seeks to use to justify his obtaining lower tax rates; rather, they merely stress that all of the circumstances of a particular case should be considered. Further, on the weight to be accorded the factor of intent, we find the Tax Court's discussion in *Prendergast, supra*, 57 T.C. at 481, to be persuasive:

"The son's statement at trial that he intended to return to the petitioner's house is not determinative of the result herein. While it is true that the statement is highly probative of *domicile*, since a person's intent to make a place his home is a requisite of domicile, the same evidence is, we think, less probative of *principal place of abode*. . . . The strongest evidence [taxpayer] offered is the son's declaration at trial. Because of its taxpayer-serving nature and the fact

---

2. Section 1.1–2 read in part:
"(c) Household. (1) In order for the taxpayer to be considered a head of a household . . . the household must actually constitute the home of the taxpayer for his taxable year. . . . Such home must also constitute the principal place of abode of at least one of the persons specified in such subparagraph (A). . . . The taxpayer and such other person must occupy the household for the entire taxable year of the taxpayer. . . . [S]uch other person will be considered as occupying the household for such entire taxable year notwithstanding temporary absences from the household due to special circumstances. A nonpermanent failure to occupy the common abode by reason of illness, education, business, vacation, military service, . . . shall be considered temporary absence due to special circumstances. Such absence will not prevent the taxpayer from qualifying as the head of a household if (i) it is reasonable to assume that the taxpayer or such other person will return to the household, and (ii) the taxpayer continues to maintain such household or a substantially equivalent household in anticipation of such return."

3. Elward does not challenge the validity of the regulation. He claims that his case comes within one of the exceptions enumerated therein, namely, "[a] nonpermanent failure to occupy the common abode by reason of . . . business . . . . ."

that it was made to achieve a legal result, we have discounted it heavily." *Contrast* Kaku Nagano v. McGrath, 187 F.2d 759, 764 (7th Cir. 1951).

Although we have found no tax cases involving the same factual situation presented here, two decisions are sufficiently similar to provide some guidance. In Estate of Adams v. Commissioner, CCH Tax Ct. Mem. 1098 (1967), the daughter of a deceased taxpayer, whose home during the year in question, 1962, was in Florida, lived and worked in North Carolina for two years, 1961–63. The daughter remained a registered voter of Florida, regarded her mother's residence in Miami as her home and kept half her possessions there. She had the intention of returning there when she left the university at which she was employed and where she took some courses. After a lengthy discussion of legislative history and regulation 1.1–2(c), the Tax Court concluded that the daughter's absence by reason of "business" should not be considered a temporary absence. "[I]t would be an unjustified extension of the Code provision to extend the head-of-household tax advantages to a taxpayer whose qualifying dependent has not only become economically independent but has also accepted full-time employment away from home for a full year at a time." CCH Tax Ct. Mem. at 1105–06.

We also note Estate of Smithson v. United States, 30 Am.Fed.Tax R.2d 72–5481 (W.D.Wash.1972), a suit for a refund for the years 1965 and 1966 based on the alleged applicability of the lower rates for a head of household. In 1962, after his Air Force Reserves unit was released from active duty, taxpayer's son had the option of remaining with the Air Force under various plans, one of which would have allowed him to remain in the Seattle area, where his mother resided, and the other leaving his location to the discretion of the Air Force. "Because Richard's efforts to get a position in commercial aviation had then proved unsuccessful, he decided to make his ca-

reer as a military pilot and chose the plan involving an indefinite commitment and location." 30 Am.Fed.Tax R.2d at 72–5482. In the tax years in question, during which time the son participated in this Air Force program, he spent his 30-day annual leave with taxpayer at her Seattle home and he kept some personal belongings in one bedroom of the mother's apartment. The district court held that taxpayer was not entitled to the head-of-household rates; the son was not "temporarily absent" from his mother's household "due to special circumstances" within the meaning of '§ 1.1–2(c)(1); "[r]ather, Richard had, prior to the years in issue, voluntarily left his mother's household and established a separate habitation, and only returned to his mother's household for periodic visits." 30 Am.Fed.Tax R.2d at 72–5483.

We need only briefly mention three decisions upon which Elward relies: Hein v. Commissioner of Internal Revenue, *supra*; Reardon v. United States, *supra*; and Smith v. Commissioner of Internal Revenue, 332 F.2d 671 (9th Cir. 1964). The first two involve the absence-for-illness example given in the regulation. We agree with the Government that those cases are so factually different as to provide no real parallel with the present case, *e. g.*, in neither *Hein* nor *Reardon* was a determination made that the dependents had established separate habitations during the tax years in question. Further, the sanitaria to which the schizophrenic dependents had gone could be considered extensions of the taxpayers' households. The holding in *Smith*, which the Internal Revenue Service has announced it will not follow, was that a taxpayer need not physically occupy the household that he furnishes to his dependent and that he can have two "homes" within the meaning of section 1(b). Thus, *Smith* concerns a taxpayer and not the person whom taxpayer seeks to use to justify his head-of-household status. The case has no precedential value here. See the discussion in *Pren-*

*dergast, supra,* 57 T.C. at 482; *cf.* Biolchin v. Commissioner of Internal Revenue, 433 F.2d 301, 302 (7th Cir. 1970).

We conclude that taxpayer Elward failed to prove that he was entitled to be taxed at the reduced rates applicable to a head of a household. He neither satisfactorily established that his apartment in Chicago was James's *"principal* place of abode" nor, alternatively, that James's absences from Chicago were, in the words of the Treasury regulation, "temporary . . . due to special circumstances[,] . . . [a] nonpermanent failure to occupy the common abode. . . . " In sum, based on our examination of the pertinent legislative history, the regulation, and the case law, we concur in the Government's opinion that Elward pointed to no evidence suggesting that Congress intended to allow favorable rates to a taxpayer who "has simply retained an extra bedroom in his apartment and [whose] son has been living in another city for over a decade, supporting himself and pursuing his own business." It was not "reasonable to assume that . . . such other person will return to the household . . . ." Reg. § 1.1–2.

Consideration of the trial judge's exclusion of certain questions and exhibits does not cause us to alter our opinion. Some of the questions not permitted were phrased in leading form. Further, some of the information sought to be introduced was contained in James's testimony, *e. g.,* his being a registered voter in Chicago, his having a key to the apartment, and his opinion that Chicago offered few business opportunities to those interested in pursuing theatrical careers. Testimony about James's passport was excluded because the best evidence, the passport itself, was not proffered. The exhibits regarding the son's jury duty were excluded as unauthenticated copies of certain jury records. James's testimony about his jury duty was properly stricken as irrelevant because his service on the jury occurred after the tax years in question. The taxpayer also failed to lay an adequate foundation for certain precinct voting records. In view of the weighty indications of James's ties to New York, the court's exclusion of James's will, which apparently was offered to show that it had been executed in Chicago, was not so prejudicial as to require the reversal of the district court's judgment.

While some of the district court's exclusionary rulings may have been on the side of unyielding adherence to the strict wording, rather than the spirit, of the rules of evidence, which is not necessarily consistent with a trial-oriented purpose of questing for the truth, nevertheless, even if all of the proffered evidence had been admitted without qualification, the epexegetic weight thereof, in our opinion, would have been insufficient to have tipped the scales in the taxpayer's favor. While many of the excluded items may well have reflected upon the son's intent to consider Chicago as his home base, it is clear that he did not in final analysis treat his father's apartment as his principal place of abode. Ties, both sentimental and mundane, with one's native heath are not easily sundered but the mere fact of retention of certain manifestations of connection with the place of birth and rearing cannot achieve for that place a status of principal abode which it does not otherwise have.

For the reasons hereinbefore set out the judgment of the district court is affirmed.

Affirmed.