ESTATE OF JEAN FOSTER FLEMING, Deceased, CITIZENS FIDELITY BANK AND TRUST COMPANY, Executor, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Fleming v. Commissioner
Docket No. 3503-72.
United States Tax Court
T.C. Memo 1974-137; 1974 Tax Ct. Memo LEXIS 183; 33 T.C.M. (CCH) 619; T.C.M. (RIA) 74137; May 29, 1974, Filed. *183 Petitioner, a widow, occupied a house with an unmarried daughter, a married daughter, and the husband and children of the married daughter. Petitioner and her unmarried daughter had their own bedroom, sitting room, office and bathroom. Of the expenses relating to the entire house petitioner paid less than half. Petitioner, however, paid over half of the expenses attributable to her and her unmarried daughter. Held: that petitioner and her unmarried daughter constituted a separate household, petitioner maintained a household, and she is entitled to head of a household treatment. Marshall P. Eldred, for the petitioners. Philip G. Owens, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent *184 determined deficiencies in petitioner's Federal income taxes as follows: Tax Year Ended
Deficiency 12-31-67
$3,849.78
12-31-68
4,549.71
12-31-69
3,692.42
Because of concessions by petitioner, the sole issue for our decision is whether petitioner is the head of a household as defined by section 1(b) (2), I.R.C. 1954. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. Jean Foster Fleming (hereafter referred to as petitioner) was a widow residing in Louisville, Ky., at the time of the filing of the petition herein. [2] She filed Federal income tax returns, as the head of a household, for the years 1967, 1968 and 1969 with the district director of internal revenue at Louisville, Ky.
Prior to her move to Louisville petitioner *185 had lived in Waupun, Wis., for many years with her unmarried daughter, Jean. The move to Louisville, in March 1961, was made so petitioner and Jean could get away from the cold winter weather of Wisconsin and live near petitioner's married daughter, Louise Mercke, and her family. Prior to the move petitioner, Jean, Louise and her husband, Evans, had discussed the type of house that would be needed to accommodate them and the three Mercke children. Initially, they sought to purchase such a house. After searching for a house to buy, however, they concluded that they would have to acquire a lot and build their own house. This was subsequently done with money provided by Jean and the Merckes. Because they built their own house it included all the features which they felt were necessary. The house was a four-level building. [3] One level consisted of a game room, recreation room, two garages, kitchenette, storage room, utility room, workshop, and patio. This level was used by everyone in the house. Above this level was another level consisting of an entrance hall, living room, family room, sun room, dining room, kitchen, pantry and bar. That, too, was an area used by all the *186 occupants of the house. Of the two remaining levels, one was used entirely by the Merckes.It consisted of four bedrooms, an office, three baths and storage rooms. The last remaining level was located below the level occupied by the Merckes. It contained a bathroom, an office, a sitting room and a bedroom which were occupied by petitioner and Jean. That level also had storage rooms, a laundry room, servant's living room, servant's bathroom and servant's bedroom. An indoor stairway connected the level occupied by petitioner with the level occupied by the Merckes. The furniture and furnishings in the part of the house occupied by petitioner and Jean were paid for by them and the furnishings and furniture in the level occupied by the Merckes were purchased by the Merckes. Furniture in other areas of the house was paid for jointly. The Merckes considered the area of the second level occupied by Jean and *187 petitioner as their "private quarters" and Jean and petitioner treated the level occupied by the Merckes as their "private quarters." The various areas of the house, however, were not physically isolated in the sense that there were barriers or other physical obstructions separating the different parts of the house. Jean and petitioner maintained a separate telephone, for which they paid the bills. They subscribed to their own magazines. In addition they gave Christmas presents, Christmas cards, wedding gifts and charitable contributions by themselves and not with the Merckes. The occupants of the house established ratios, at the outset, for determining the portion of common expenses to be borne by each of them. A joint bank account ("Joint Account") was established from which payments for mortgage interest, property taxes, property insurance, upkeep and repairs, yard care and replacement costs were paid. Petitioner and Jean together were to contribute one-half the deposits to that account and the Merckes were to contribute the other half. An account denominated "Special Account" was established from which payment for food, utilities and servant's pay were to be made. Petitioner *188 and Jean together were to contribute one-third of the money to that account and the Merckes were to pay the remainder. Petitioner and Jean entered into a written agreement dated March 10, 1966, whereby petitioner agreed to pay at least 51 percent of their share of the expenses relating to the house. In order to facilitate their agreement they established a bank account designated the "Household Account." Pursuant to the agreement petitioner deposited $7,000 in the "Household Account" during each of the years in question. For the same years Jean deposited $6,000 annually. Of the money deposited in the "Household Account" by petitioner for the years 1967, 1968 and 1969, $6,110.24, $6,078.55 and $5,620.75, respectively, were placed in the "Joint Account" and the "Special Account" in payment of her share of total expenses. Of the money deposited in the "Household Account" by Jean during the same years $5,237.34, $5,210.19 and $4,817.79 were paid into the "Joint and Special Accounts." The total expenses relating to the residence for the taxable years 1967, 1968 and 1969 were in the amounts of $29,282.05, $28,141.90 and $26,493.03, respectively. OPINION It is respondent's position *189 that petitioner fails to qualify as the head of a household because she does not meet the requirements of section 1(b) (2) (A). His primary argument is that Jean, petitioner and the Merckes constituted one household and that petitioner did not provide over one-half the cost of that household. Petitioner, on the other hand, maintains that the house contained two households, one of which consisted of herself and Jean. It follows, according to petitioner, that she was the head of that household because she provided over one-half the cost of maintaining it. Thus, the outcome depends upon whether the four rooms occupied by Jean and petitioner should be considered a household. The extent of a "household" is not determined solely by physical or tangible boundaries; instead we must look to all of the facts in any particular case. John Robinson, 51 T.C. 520 (1968), affd. 422 F.2d 873 (C.A. 9, 1970), acq. 1970-1 C.B. XVI; Reardon v. United States, 158 F. Supp. 745 (D.S.D. 1958). Respondent argues that the entire house was one household. He looks to the fact that petitioner and Jean did not confine themselves to their quarters. They ate in the *190 dining room and used other areas of the house. In addition, respondent asserts that petitioner and Jean had access to all areas of the house including the Merckes' quarters and the Merckes had access to petitioner's quarters. It is respondent's position that the foregoing is an indication that the whole house was one household. There is some merit in respondent's position, but we are not persuaded. While it is true that the two families were not excluded from each other's quarters by physical barriers, the record indicates that the Merckes and Flemings respected each other's quarters as private areas which were not to be disturbed. Also, while petitioner's use of other areas of the house is a factor to be considered, it is not determinative. In Robinson the petitioner's (parents) [4] occupied a single room in a rest home. They presumably took their meals with other occupants and used other areas of the house. Yet, we held that the "household" that petitioner maintained consisted of his (parent's) single room. *191 While the issue is close, it is our view there are other factors which outweigh those relied upon by respondent. Petitioner and Jean lived together in Wisconsin for many years and during that time grew accustomed to a particular life style. Thus, when they decided to move to Kentucky, it was with the intention of living near the Merckes, but retaining their privacy and familiar pattern of living. They decided, after consultation with the Merckes, that it might be possible to find a single house for all of them which would allow both groups to retain a degree of privacy. After a prolonged search, however, all concerned realized that a suitable house could not be found; so they decided to design and build their own. An architect was commissioned to design a building with separate quarters for the Flemings and Merckes. In accordance with their instructions the architect designed and there was built a separate area of the house for Jean and petitioner which included their own office, bedroom, bathroom and sitting room. It is clear from the foregoing that separate households were intended and in our opinion resulted. Furthermore, petitioner and Jean conducted themselves as a *192 separate household during the years involved. They maintained a separate telephone and paid the bills therefor. They subscribed to magazines independently of the Merckes. In addition the Flemings gave Christmas presents, Christmas cards, wedding gifts, and charitable contributions by themselves rather than with the Merckes. In effect, Jean and petitioner acted independently of the Merckes in matters not related to the house. Because of the nature of the statute here under consideration and lack of precise meaning for the word "household" used therein, we consider it proper to give the statute the most favorable reasonable construction to support petitioner's right to compute his [her] tax as head of household. * * * [Robinson, supra at 539.] See also Reardon, supra. In the instant case it would be an elevation of form over substance to say that only one household existed simply because only one building was involved and certain areas were used in common. Respondent makes the alternative argument that if we find that petitioner's quarters qualify as a "household" then petitioner should not be considered the head of a household because the household *193 she occupied was not her home. He then reiterates his prior arguments in an attempt to prove that petitioner's home was the entire house. We reemphasize the point in our prior discussion that a taxpayer's household is not determined by physical boundaries but by all the facts of the case. Laraia v. United States, 232 F. Supp. 602 (D. Mass. 1964). We have previously held, moreover, that the meaning "home" shall be used for the word "household." Robinson, supra.
Finally, respondent states that Congress enacted head of household rates because it intended to relieve the tax hardship upon persons in such circumstances as widowed taxpayers with dependent children or taxpayers with adult dependents. He continues that in the instant case petitioner has failed to demonstrate that she was in any way required to maintain a household for Jean or that either of them lacked sufficient income to live alone or that there was any other necessity for the petitioner to maintain a home for Jean. We would first point out that petitioner is not required to prove any of the above. In addition, the legislative history of the predecessor of section 1(b) (2) (A) specifically *194 refutes respondent's argument. The report of the Committee on Ways and Means in reference to the House bill states as follows: If the person, whose principal place of abode is the home of the taxpayer, is an unmarried person as described in subparagraph (A), that is, a child or descendent of a child of a taxpayer, the taxpayer may (if the other requirements of section 12(c) are met) qualify as a head of household even though the taxpayer would not be entitled to an exemption for such person as a dependent under section 25(b). Thus, an unmarried taxpayer who maintains as his home a household which includes only himself and his unmarried son, may be the head of the household even though the taxpayer does not furnish more than half the support of the son and even though the son has gross income of $500 or more. [5] * * * [H. Rept. No. 586, 82d Cong., 1st Sess. (1951), 1951-2 C.B. 433.] *195 Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended. All references to section 1(b) (2)↩, however, are to that section prior to its amendment by P.L. 91-172. 2. Mrs. Fleming died on December 8, 1972, and the caption in the present case was changed accordingly on motion of decedent's executor. For convenience sake, however, we shall refer to Mrs. Fleming as petitioner. ↩
3. The stipulations speak in terms of the first, second, third and fourth levels and state that the petitioner and Jean occupied part of the second level and the Merckes the fourth level. The house plans indicate that the second level was directly below the fourth level. ↩
4. In Robinson the petitioner's parents shared a room in a rest home during part of 1961. In July or August petitioner's mother was taken to a sanatarium where she lived until her death in October 1961. After the mother left the rest home petitioner's father remained in the room that they had shared until November 1961 when he moved to a boarding house for the aged. At the boarding house the father shared a room approximately 12 feet by 20 feet with another gentleman. ↩
5. The Floor Discussion in the House also involved this point. Congressman Doughton, Chairman of the Committee and floor manager of the legislation, stated as follows: Where unmarried children are involved, this relief will be granted, regardless of how much income the unmarried child or grandchild living with the taxpayer may have, so long as the taxpayer furnishes more than one-half of the household expenses. [97 Cong. Rec. 6891 (1951, part 5)] The Senate Report states that: Under this definition [of Head of Household] it is immaterial how much gross income an unmarried child or grandchild living with the taxpayer may have. [S. Rept. No. 781, 82d Cong., 1st Sess. (1951) 1951-2 C.B. 464.] Accordingly, we hold that petitioner did qualify as the head of a household. Decision will be entered under Rule 155. ↩