WALTER PETLOW, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Petlow v. Commissioner
Docket No. 5083-73
United States Tax Court
T.C. Memo 1975-13; 1975 Tax Ct. Memo LEXIS 358; 34 T.C.M. (CCH) 51; T.C.M. (RIA) 750013; January 27, 1975, Filed Walter Petlow, pro se. *359 Matthew W. Stanley, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined a deficiency of $915.11 in petitioner's Federal income taxes for the calendar year 1970. The parties have reached agreement on some of the disputed items, leaving for our decision only the question whether petitioner is entitled to compute his tax under the rates applicable to an unmarried head of household. [1] We hold that he is. FINDINGS OF FACT Some of the facts are stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner is an individual who resided in Seattle, Washington, at all times material to this proceeding. He filed his 1970 Federal income tax return with the Western Service Center, Ogden, Utah. Prior to November *360 1969, petitioner lived together with his wife and four children in a house on Sixty-first Avenue South, on the south side of Seattle. In August 1969, petitioner filed for a divorce from his wife but continued to live in the house until November of that year, at which time he removed himself on the advice of counsel. From the time he left the family residence until he moved back in September 1970, petitioner occupied other premises on the south side of Seattle, first in a rented apartment and then in a duplex which he owned. Petitioner stayed in those places in order to be close to the family residence. He intended at all times to return to the house on Sixtyfirst Avenue as soon as practicable. He continued to treat the latter as his residence address and received all of his mail there, with the exception of confidential communications regarding the divorce. He also used that address for his bank accounts and his auto registration. In December 1969, petitioner was ordered to pay temporary alimony of $200 per month and child support of $300 per month, along with certain household expenses. [2]
Petitioner's wife had emotional difficulties which he *361 felt adversely affected her ability to care for their children, and he sought to obtain custody of them as a part of the divorce settlement. His paramount wish, however, was to keep the children together and to avoid dividing them between himself and his wife. To that end, he offered to let his wife have the Sixty-first Avenue residence as part of a property settlement if she would take custody of the children. This offer was never accepted. At the end of September 1970, after petitioner's wife moved out of the family residence, petitioner returned to the house and assumed full care of the children. Petitioner and his wife were divorced in November 1970. As part of the decree, petitioner was awarded custody of the children and title to the house on Sixty-first Avenue. No provision was made for alimony or child support. Petitioner claimed and was allowed dependency deductions for all four children on his 1970 return. The cost of maintaining the household on Sixty-first Avenue during 1970 was approximately as follows: Insurance
$ 139
Property Taxes
427
Mortgage Interest
498
Utilities ($45/month)
540
Repairs, etc. ($35/month)
420
Food ($235/month)
2,820
Total
$4,844
*362 Petitioner paid the property taxes, mortgage interest, and homeowner's insurance premium directly. The cost of utilities, repairs, and food was paid directly by petitioner for the last three months of 1970, while from January to September those items were paid for out of funds available to petitioner's wife. Those funds were: Wages (take-home)
$2,932
Rentals
1,225
Alimony
1,800
Total separate
resources
5,957
Child support
$1,800
Total Resources
$7,757 [3]
*363 During the time she lived in the Sixty-first Avenue home in 1970, petitioner's wife incurred out-of-pocket expenses of $335 in connection with rental property she owned, which she paid out of her own funds. [4]
ULTIMATE FINDINGS OF FACT 1. The Sixty-first Avenue household was petitioner's home throughout 1970. 2. Petitioner furnished more than half the cost of maintaining that household. OPINION Respondent seeks to deny petitioner the benefit of head-of-household rates on two factual grounds. He argues, first, that petitioner did not pay over half of the Sixty-first Avenue household's maintenance *364 expenses, and, second, that petitioner did not maintain as his home a household which constituted the principal place of abode of his dependents. We find that petitioner has successfully disproved both assertions. A. Household Maintenance Expenses
In order to qualify as head of household, petitioner must prove that he furnished over half of the cost of maintaining such a household during the taxable year. Section 1(b)(2). Respondent's regulations describe the items to be taken into account in making this determination: The taxpayer shall be considered as maintaining a household only if he pays more than one-half the cost thereof for his taxable year. The cost of maintaining a household shall be the expenses incurred for the mutual benefit of the occupants thereof by reason of its operation as the principal place of abode of such occupants for such taxable year. The cost of maintaining a household shall not include expenses otherwise incurred. The expenses of maintaining a household include property taxes, mortgage interest, rent, utility charges, upkeep and repairs, property insurance, and food consumed on the premises. Such expenses do not include the cost of clothing, *365 education, medical treatment, vacations, life insurance, and transportation. In addition, the cost of maintaining a household shall not include any amount which represents the value of services rendered in the household by the taxpayer or by a person qualifying the taxpayer as a head of a household. Section 1.1-2(d), Income Tax Regs.[5] This is both a different and more restrictive definition than that of "support" within the meaning of section 152. [6] We are satisfied that the items enumerated in our findings of fact include all significant expenditures made on behalf of the household in question. Of the $4,844 total maintenance cost, petitioner's direct expenditures were these: Insurance
$ 139
Property taxes
427
Mortgage interest
498
Utilities (3 months)
135
Repairs (3 months)
105
Food (3 months)
705
Total
$2,009
*366 The remaining $2,835 was paid by petitioner's wife during the period January through September 1970, but some portion of it must be attributed to petitioner's child support payments. Our findings indicate that, after excluding her separate business expenditures of $335, petitioner's wife had available approximately $7,400 for household maintenance and other family expenses, of which $1,800, or approximately 24 percent, was provided by petitioner in the form of child support. Although we need not and do not make a finding as to any specific allocation, we may observe that if 24 percent of the household expenditures made by petitioner's wife were attributed to petitioner, in addition to the direct expenditures which he incurred, he would have expended over half the total cost of maintaining the household, i.e., $2,009 plus $680 (24 percent of $2,835), or $2,689. Thus, he has proved to our satisfaction that he paid more than half the household's maintenance expenses. B. Petitioner's Home
The other statutory prerequisite to head-of-household status is that petitioner maintain "ashishome a household which constitutes * * * the principalplaceofabode *367 * * * of [his children]." Section 1(b)(2)(A) (emphasis added). [7] There is no dispute over the fact that the Sixty-first Avenue household was the principal place of abode of petitioner's four children during 1970. Respondent, however, contends that petitioner's physical absence from the house (other than for brief visits) from January to September precludes a finding that he made his "home" there. Respondent's regulations, perhaps mindful of the poetic dictum, [8] elaborate on the statutory language: (c) Household. (1) In order for the taxpayer to be considered a head of a household by reason of any individual described in subparagraph (A) of section 1(b) (2), the household must actually constitute the home of the taxpayer for his taxable year. A physical change in the location of such home will not prevent a taxpayer from qualifying as a head of a household. Such home must also constitute the principal place of abode of at least one of the persons specified in such subparagraph (A). It is not sufficient that the taxpayer maintain the household without being its occupant. The taxpayer and such other person must occupy the household for the entire taxable year of the taxpayer. *368 * * * The taxpayer and such other person will be considered as occupying the household for such entire taxable year notwithstanding temporary absences from the household due to special circumstances. * * * Such absence will not prevent the taxpayer from qualifying as the head of a household if (i) it is reasonable to assume that the taxpayer or such other person will return to the household, and (ii) the taxpayer continues to maintain such household or a substantially equivalent household in anticipation of such return. Section 1.1-2(c), Income Tax Regs. (emphasis added). [9] Respondent bases his position on the first emphasized provision. Petitioner, on the other hand, relies on the second, contending that his absence from the home was temporary and due to special circumstances. [10]
*369 We have held that the "true test" of whether a dependent has ceased to maintain a principal place of abode in the taxpayer's home is "whether there are indications that a new permanent habitation has been chosen." Walter J. Hein,28 T.C. 826, 835 (1957). [11] We can imagine no purpose in applying a stricter rule when the absence is that of the taxpayer himself and the issue is whether the household was his actual abode. W. E. Grace,51 T.C. 685 (1969), affirmed per curiam, 421 F.2d 165 (C.A. 5, 1969). There is no doubt that petitioner intended to return to the household in which his children resided, and the record as a whole convinces us there was little likelihood that his wife would accept permanent custody of all four children--the only condition on which petitioner was willing to surrender possession of the family home. Petitioner's temporary departure on the advice of counsel does not, on these facts, demonstrate that he abandoned the Sixty-first Avenue residence as his "home"; on the contrary he maintained close ties with the household and his absence was due to special circumstances within the meaning of the Regulations.[12] *370 In the context of the record as a whole, we do not consider petitioner's offer to let his wife have the residence significant--an offer which, in any event, was not accepted. Petitioner is therefore deemed to have occupied the household throughout the taxable year, and is entitled to be taxed at the rates applicable to a head of household. To reflect the parties' concessions, Decision will be entered under Rule 155.
Footnotes
1. Section 1(b)(2). All statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue. A substantially similar provision applicable to years after 1970 is embodied in section 2(b), as amended by the Tax Reform Act of 1969, P.L. No. 91-172, sec. 803(a), 83 Stat. 487, 682.↩
2. See footnote 3, infra.↩
3. There are some discrepancies in the record herein. Thus, petitioner's wife stated in the proceedings in the divorce court that she received $328 net take-home pay per month while the W-2 form accompanying her tax return for that year shows $4,188. Similarly, it is not clear whether petitioner should be considered as having paid more than $1,800 in child support during the period when his wife occupied the family home with the children. In making our calculations, we have utilized figures most unfavorable to petitioner, to wit, we have used a pro-rata portion of $4,188 (the larger figure) for the period March through September when petitioner's wife was working and contributing to the maintenance of the household and $1,800 (the lower figure) for petitioner's contribution via child support payments for the period January through September.↩
4. There is some indication that petitioner's wife saved some money out of the resources available to her in 1970. There is also some evidence that she paid legal fees of $1,228, medical bills of $215.50, $40 for an auto license, and $59.50 for charitable contributions. We have not taken these items into account because they do not affect our conclusion. At most, they would only reduce the amount of funds available to her, since, in any event, they are not the type of expenditure that would be taken into account for purposes of section 1(b)(2). See Sec. 1.2-2(d), Income Tax Regs.↩
5. Section 1.2-2(d)↩ of the current Regulations is substantially identical. 6. See section 1.152-1(a)(2), Income Tax Regs. Thus, for example, the fair rental value of a house owned by the taxpayer is not taken into account in determining whether more than one-half of the cost of maintaining the household has been provided. See Donald G. Teeling,42 T.C. 671, 683 (1964); Nat Glogowski, Sr.,T.C. Memo. 1967-236↩.
7. Now section 2(b)(1)(A). ↩
8. "It takes a heap o' livin' in a house to make it home * * *." E. A. Guest, Home↩ (1916). 9. This corresponds to section 1.2-2(c)↩ of the current Regs. 10. This case arises in the Ninth Circuit. Because we agree with the above contention of the taxpayer, it is unnecessary for us to decide whether the instant case is governed by Smith v. Commissioner,332 F.2d 671 (C.A. 9, 1964), reversing 40 T.C. 591 (1963), which held the Regulations invalid to the extent they require "physical personal occupancy" by the taxpayer. 332 F.2d at 673. Jack E. Golsen,54 T.C. 742 (1970), affd. 445 F.2d 985 (C.A. 10, 1971), cert. denied, 404 U.S. 940. Cf. Muse v. United States,434 F.2d 349 (C.A. 4, 1970); W. E. Grace,51 T.C. 685 (1969), affirmed per curiam, 421 F.2d 165 (C.A. 5, 1969); Doris I. Leeds,T.C. Memo. 1974-110↩.
11. See David B. Williams,53 T.C. 58 (1969), affd. 441 F.2d 1168 (C.A. 9, 1971); Winona Bell Hunt,T.C. Memo. 1972-226. Cf. Elward v. United States,484 F.2d 596↩ (C.A. 7, 1973).
12. An instructive opinion on strikingly similar facts is Laraia v. United States,232 F. Supp. 602 (D. Mass. 1964). Petitioner was under no such restriction against occupying the residence as existed in W. E. Grace, supra,51 T.C. at 692↩.